IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PAUL L. JOHNSON,

        Petitioner,

v.                                          CIV 10-0745 JCH/KBM

TIMOTHY HATCH, Warden,
Northeast New Mexico Detention Facility,
and GARY G. KING, Attorney General for
the State of New Mexico,

        Respondents.

# PROPOSED FINDINGS
# &
# RECOMMENDED DISPOSITION

THIS MATTER is before the Court on Paul Johnson's *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Because he filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its standards apply to this case. *See e.g., Abdul-Kabir v. Quarterman,* 550 U.S. 233, 246 (2007); *DeLozier v. Sirmons,* 531 F.3d 1306, 1319 (10th Cir. 2008), *cert. denied,* 129 S. Ct. 2058 (2009). All of the issues can be resolved on the present record. Therefore, further expansion and an evidentiary hearing are unnecessary. *See e.g., Schriro v. Landrigan,* 550 U.S. 465, 474 (2007); *Hooks v. Workman,* 606 F.3d 715, 730-31 (10th Cir. 2010); *Alverson v. Workman,* 595 F.3d 1142, 1164 (10th Cir.), *cert. denied,* 131 S. Ct. 512 (2010); Rules 6-8, RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS. I recommend that the petition be denied.

# I.  Overview

After shooting and killing an acquaintance over a debt, Petitioner turned himself in and confessed.  The crime occurred spur-of-the-moment.  While riding in a car driven by his wife Marie, Petitioner spotted the victim on the side of the street.  Petitioner instructed his wife to pull over the car, in which his nine-year-old daughter Angelique was also a passenger.  Petitioner then got out of the car, confronted the victim, they argued, and Petitioner fired his pistol.  After Petitioner unsuccessfully attempted to suppress his statements to the police, trial commenced.

Petitioner testified that the victim, who was known to carry a gun, put his hand in this pocket and started to withdraw something metallic.  The jury did not credit Petitioner's version of the events.  Although they acquitted him of some charges, they found him guilty of second-degree murder.  To do so, they had to find that Petitioner did not shoot as a result of sufficient provocation and that he did not act in self-defense.  They also found Petitioner guilty of child abuse by negligent endangerment and of tampering with evidence.  With firearm and uncontested habitual offender enhancements, Petitioner is serving a twenty-one–year prison sentence.  *See, e.g., Doc. 16-1* at 4-6, 10-16, 22-23, 40-43; *Trial Transcript 1/27/09* at 109-131; *Trial Transcript 1/28/09* at 25-56; *Trial Transcript 1/29/09* at 28-89; *Record Proper* at 231, 254-61.

The initial federal petition raises three claims.  A tendered amended petition expands on one of those claims, and adds an ineffective assistance of counsel claim for failure to investigate and call additional witness who would have supported the theory of self-defense.  In a separate "motion" to amend, Petitioner adds another aspect to his ineffectiveness claim, expands on other claims, and requests discovery and an evidentiary hearing.  The Court took his requests to amend under advisement pending receipt of the Record Proper and Respondents' Answer.  *See Docs. 1,*

*13-18.*  Respondents assert that certain claims are unexhausted and/or procedurally defaulted because Petitioner did not file a timely petitioner for certiorari with the New Mexico Supreme Court on either occasion when trial judge denied state habeas relief.  *See Doc. 16* at 11.

Rather than address any "futility" arguments, the Court will permit amendment and also consider the claims sought to be added.  Some of Petitioner's federal claims are partially exhausted, others have never been presented to the New Mexico state courts, some are procedurally defaulted (though not for the reasons asserted by Respondents), and some  are not generally cognizable as a basis for habeas relief.  None of warrant habeas relief on the merits.

## II.  General Standards Of Review

### A.  AEDPA

Three AEDPA provisions mainly govern the standard for federal habeas review.  In general, for cognizable federal claims, if a state court denies a claim on the merits, then habeas relief cannot be granted unless the state decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). Factual determinations made by a state court are presumed to be correct unless Petitioner can rebut them by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).

When a state court does not resolve the claim "on the merits and [it] is not otherwise procedurally barred, [the federal habeas court's] standard of review is more searching . . . because § 2254(d)'s deferential standards of review do not apply in such circumstances." *Alverson,* 595 F.3d at 1146. This Court will review such claims *de novo,*[1] under the traditional

---

[1]  This sort of review is commonly referred to as "*de novo,*" but does not mean this Court ignores the federal habeas rules that require review based on the state court record and limit the circumstances under

habeas comity considerations that predate AEDPA and require due deference to state court

decisions and criminal convictions.  *See e.g., Harrington v. Richter,* ___ U.S. ___, ___, 131 S.

Ct. 770, 786 (2011) ("Section 2254(d) reflects the view that habeas corpus is a guard against

extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error

correction through appeal.") (quoting Justice Stevens' concurrence in *Jackson v. Virginia,* 443

U.S. 307, 332, n. 5 (1979)).[2]

   If it is easier to dispose of an unexhausted or procedurally-defaulted claim on the merits,

then this Court may do so.  *See Sandoval v. Ulibarri,* 548 F.3d 902, 915 (10th Cir. 2008)  ("Under

---

which a federal evidentiary hearing is required. *See, e.g., Lockyer v. Andrade,* 538 U.S. 63, 71 (2003) (rejecting Ninth Circuit approach that "requires federal habeas courts to review the state court decision *de novo* before applying the AEDPA standard of review"); RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS (habeas rules for review after answer).

[2]  *See also, e.g., Jefferson v. Upton,* ___ U.S. ___, ___, 130 S. Ct. 2217, 2220-22 (2010) (discussion of statutory and *Townsend* directives concerning deference to state court factual conclusions); *Danforth v. Minnesota,* 552 U.S. 264, 274-82 (2008) (discussion of development of *Teague* nonretroactivity principle that will preclude habeas relief); *Fry v. Pliler,* 551 U.S. 112, 116-17 (2007) ("we rejected the *Chapman* standard in favor of the more forgiving standard of review [because] application of *Chapman* would undermine the States' interest in finality . . . would "infringe upon the States' sovereignty over criminal matters . . . would undercut the historic limitation of habeas relief to those grievously wronged . . . and would impose significant social costs") (internal quotations, citations, and bracketed editing omitted); *Williams v. Taylor,* 529 U.S. 362, 375 (2000) ("It is, of course, well settled that the fact that constitutional error occurred in the proceedings that led to a state-court conviction may not alone be sufficient reason for concluding that a prisoner is entitled to the remedy of habeas."); *id.* at 383 ("The *Teague* cases reflect this Court's view that habeas corpus is not to be used as a second criminal trial, and federal courts are not to run roughshod over the considered findings and judgments of the state courts that conducted the original trial and heard the initial appeals.  On the contrary, we have long insisted that federal habeas courts attend closely to those considered decisions, and give them full effect when their findings and judgments are consistent with federal law."); *Coleman v. Thompson,* 501 U.S. 722, 747-48 (1991) ("Recognizing that the writ of habeas corpus is a bulwark against convictions that violate fundamental fairness, we also acknowledged that 'the Great Writ entails significant costs. . . . The most significant of these is the cost to finality in criminal litigation that federal collateral review of state convictions entails") (internal quotations and citations omitted); *Miller v. Fenton,* 474 U.S. 104, 112 (1985) (though issue of voluntariness of a confession is a legal question federal habeas courts decide "independently," a "federal habeas court, should, of course, give great weight to the considered conclusions of a coequal state judiciary.") (citing *Culombe v. Connecticut,* 367 U.S. 568, 605 (1961) (opinion of Justice Frankfurter)); *Jackson,* 443 U.S. at 323 ("A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. . . . The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state post-conviction remedies to redress possible error. . . . What it does not presume is that these state proceedings will always be without error in the constitutional sense.").

the circumstances, we will not decide this murky issue of procedural bar because the claim is easily defeated on the merits."); *Moore v. Schoeman,* 288 F.3d 1231, 1235 (10th Cir. 2002) (quoting legislative history to § 2254(b)(2) that, among other things, provides the statute "will also help to avoid potentially burdensome and protracted inquiries as to whether state remedies have been exhausted, in cases in which it is easier and quicker to reach a negative determination of the merits of a petition [but] does not undermine the policy of comity to state courts that underlies the exhaustion requirement, since the federal habeas court would only be permitted to deny an unexhausted claim.") (internal quotations and citations omitted).  That is the course I recommend.

### B. Strickland

To establish ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668 (1984), Petitioner must establish two things – that counsel's conduct was constitutionally deficient and that, but for the conduct, the result of the proceeding would have been different. *E.g., Harrington,* ___ U.S. at ___, 131 S. Ct. at 787; *Burghuis v. Thomkins,* ___ U.S. ___, ___, 130 S. Ct. 2250, 2264 (2010); *Strickland,* 466 U.S. at 687.  Failure to make either showing defeats the claim.  *E.g., Smith v. Robbins,* 528 U.S. 259, 286, n.14 (2000); *Strickland,* 466 U.S. at 687.  The *Strickland* standards set a "high bar" for petitioners to surmount, and the habeas court's review, "[e]ven if *de novo* . . . is a most deferential one."  *Harrington,* 131 S. Ct. at 788.

"To establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness."  *Id.* 787 (internal quotations and citations omitted). That conduct must amount to "errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *Id.* (same).  The question is not whether counsel's conduct "deviated from best practices or most common

custom," but whether "an attorney's representation amounted to incompetence under prevailing professional norms." *Id.* at 788 (same). In considering the first *Strickland* prong, this Court must not succumb to the temptation to "second-guess counsel's assistance after conviction or adverse sentence." *Id.* (same).

To establish prejudice, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and a "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Id*. at 787 (same). "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* (same). Instead, "[c]ounsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 787-88 (same).

## III.  Procedural Defaults Raised By Respondents

The direct appeal concluded on June 2, 2010, when the New Mexico Supreme Court denied certiorari. *See Record Proper* at 372; *Doc. 16-2* at 29. On August 11, 2010, the Clerk of this Court filed the federal petition. *See Doc. 1* at 1. The next day, the state clerk filed Petitioner's first state habeas petition. *See Record Proper* at 382-401.[3] With dual actions for habeas relief pending, when Respondents filed their initial Answer as ordered by this Court, they requested an extension to answer until after the state proceedings concluded. This Court thus stayed the federal action. *See Docs. 6, 8, 9.*

### A.  The Claims At Issue

The claims that Petitioner raised and defaulted in the state courts, and now seeks to raise

---

[3]  Petitioner explained that he would have instituted the state post-conviction proceedings earlier, but prison officials seized his legal documents during a transfer, lost them, and he was pursuing a state tort claim to recover the documents. *See Doc. 1* at 4 & n. 1, 22; *see also Record Proper* at 340-55.

in the federal action,[4] are examples of what he characterizes as trial counsel's ineffectiveness due to "perfunctory representation." *See Record Proper* at 388. A friend of the victim, Ernest Benjamin, testified the victim was known to carry a gun and had it the day of the shooting. *See Trial Transcript 1/29/09* at 91. The victim's girlfriend, Linda Toledo, testified the victim was only carrying a cell phone and a money clip, but no gun or knife, and reluctantly admitted she removed drugs from the victim's body after he had been shot. *See Trial Transcript 1/27/09* at 52-56, 73, 77-78.

Petitioner faults trial counsel for failing to "investigate" and "present" evidence that because several people took items from the victim before the police arrived, it follows that they also took the gun the victim pulled on Petitioner and replaced it with a knife. Specifically, Petitioner asserts counsel should have introduced evidence and/or argued: the victim's brother took the victim's his cell phone, which Clara Finley later attempted to sell to Wilbert Burks; a money clip was found next to body, bloody female rings were found in victim's pants pockets; Toledo's hands and knees pants were bloody, and there were bloody shoe prints leading in different directions from the body; letters Petitioner acquired from Valencia Yazzie and LaShanda Galde stated Toledo gave the victim the knife, set him up and was happy he was dead; and about the identity of the print on the knife found next to the body, which counsel refused to

---

[4] He cast the same arguments discussed above more legalistically, but cursorily, in one claim of his amended state petition. He also added two ineffective assistance of counsel claims for failure to submit a jury instruction on these "mitigating" factors. *See Record Proper* at 404-05 (cursory assertions in amended state petition: "whether counsel deprived the jury of crucial evidence, creating prejudice against his client by counsel's failure to investigate and produce critical mitigating factors for the jury to consider?;" "Whether trial counsel deliberately withheld crucial information by counsel's failure to submit proper jury instructions regarding mitigating circumstances?; "Whether trial counsel deprived her client of due process by her failure to instruct the jury of critical mitigation circumstances and her actions of cumulative errors depriving her client of a fair and impartial trial?") (certain spelling and punctuation amended for clarity); see also *Trial Transcript 1/29/09* at 65-67 (sidebar conference about condition of the surveillance recording). However, in the federal proceedings Petitioner has abandoned any ineffective assistance of counsel claims based on jury instructions, psychological evaluation, or expert video testimony. *Compare Record Proper* at 396, 398-99, 405, *with Docs. 1, 13, 14.*

have tested.  *See Record Proper* at 389-98; *Doc. 13* at 12.  Petitioner asserts that had the jurors

heard all of this evidence, there is a reasonable probability they "would have believed his theory

of the case . . . '[the victim] went into his pockets with his hands.  Because he was known to

carry a gun, I shot first.'"  *Record Proper* at 389 (source of quote unclear but consistent with

Petitioner's trial testimony on the subject, *see Trial Transcript 1/29/09* at 4-41, 51-52, 62).

### B.  Procedural Defaults For Failure To Petition For Certiorari

Petitioner moved to amend on October 8, 2010, which the trial judge implicitly granted

when he summarily dismissed both the initial and amended state petitions on November 16,

2010.  *See, e.g., id.* at 402-08.  Petitioner did not immediately pursue a petition for certiorari

with the New Mexico Supreme Court.  Instead, on December 22, 2010,[5] he filed a motion with

the trial court asserting that it was not acting "promptly" as required by Rule 5-802(E), and that

he wanted it to act so that he could proceed with his federal action.  *Id.* at 409-14.  The trial

judge did not act on the motions.

On March 27, 2011, Petitioner contacted the New Mexico Public Defender.  He asserted

that "as far as [he knew], the petition has not been dismissed," and that he had "written to the

court on several occasions, to no avail."  *Doc. 13-1* at 1.  He believed that, since his petition was

still pending, the trial judge may have contacted the office "for appointment of counsel to

represent" him.  *Id.*  An administrator from the public defender office responded months later, on

May 16, 2011.  She included a copy of the trial judge's November 2010 summary denial, and

advised that, if he chose, he could apply for certiorari with the New Mexico Supreme Court.  The

letter warned him to be "mindful of the deadlines set out in SCRA 12-501," but made no

mention of the fact that his thirty-day time to file had long expired or that because so much time

---

[5] The state clerk crossed out that file-stamp and re-stamped the motion on December 30, 2010.  *See Record Proper* at 409, 412.

had passed, under the applicable rules he had no avenue for securing an extension of time in which to file.

Less than two weeks after receiving the public defender's response, Petitioner asked the New Mexico Supreme Court for permission to file a belated petition for writ of certiorari. He recounted the steps he had taken to ascertain the status of his state petition and that he just received notice his state petition had been denied. *See id.* at 10; *Doc. 13-2* at 1-8. On June 3, 2011, the Clerk of New Mexico Supreme Court received Petitioner's request but returned it as untimely, explaining that the rule "will not allow us to accept a petition for a writ of certiorari that is late for any reason." *Doc. 16-3* at 14 (duplicated *Doc. 13-2* at 9).

The timeliness rules enforced by the New Mexico Supreme Court[6] constitute a procedural default for federal habeas purposes. This is true even though the rules permit belated petitions under certain circumstances for which Petitioner did not qualify. *See, e.g., Holt v. Bravo,* 424 F. App'x 793, 794 (10th Cir. 2011) ("The New Mexico procedure for appealing a state district court's denial of a petition for writ of habeas corpus is to file a petition for certiorari with the Supreme Court of New Mexico within thirty days. . . . Holt did not file a petition for certiorari within thirty days. Thus, we agree with the district court that Holt procedurally defaulted his claims."); *Santillanes v. LeMaster,* 12 F. App'x 728, (10th Cir. 2001) ("In an attempt to show that New Mexico does not apply [the 12-501] deadline evenhandedly or

---

[6]   Under Rule 5-802(H)(2) and Rule 12-501(B), a state petitioner has thirty days to petition the New Mexico Supreme Court for certiorari after a denial of state post-conviction relief. Belated petitions may be allowed under limited circumstances. Under Rule 12-501(C)(1)-(3), upon a showing of good cause, the New Mexico Supreme Court has discretion to authorize an extension. However, motions for good cause must be filed within thirty days of the trial judge's decision. Upon a showing of excusable neglect or circumstances beyond a petitioner's control, the Supreme Court also has discretion to authorize an extension. However, motions for excusable neglect must be filed within sixty days of the trial judge's decision. If a request for an extension is filed later than sixty days from the trial judge's decision, the New Mexico Supreme Court has no discretion to grant an extension.

consistently, petitioner cites cases [where] while recognizing the possibility of unusual circumstances justifying a late filing, the New Mexico Supreme Court ultimately refused to excuse the untimely filing.  This falls short of a showing that certiorari deadlines in habeas cases are not regularly followed.  We conclude that the thirty-day deadline for filing petitions for certiorari is applied evenhandedly and is both "independent" and "adequate" for purposes of procedural bar."); *see also, e.g., Stone v. Moore,* 644 F.3d 342, 345 (6th Cir. 2011) ("The Supreme Court clarified the laws governing procedural default in two recent decisions, *Beard* . . . and *Walker* . . . .  In *Beard,* the Supreme Court held that, 'a discretionary state procedural rule can serve as an adequate ground to bar federal habeas review," because it can be considered "firmly established.' . . .  Extending the precedent it set in *Beard,* in *Walker* the Supreme Court emphasized the practical importance of 'preserving the flexibility' of states' discretionary procedural rules. . . .  Thus, the Supreme Court held in *Walker* that even wholly discretionary state procedural rules may constitute adequate state grounds for foreclosing federal review of a habeas claim.") (quoting and citing *Beard v. Kindler,* ___ U.S. ___, ___130 S. Ct. 612, 681 (2009), and *Walker v. Martin,* ___U.S. ___, ___, 131 S. Ct. 1120, 1125, 1128 (2011)).

On June 16, 2011, Petitioner advised this Court of the state proceedings.  After having received no response by Respondents, this Court lifted the federal stay on July 11, 2011, and reinstituted deadlines for submission of an amended federal petition, answer, and Record Proper.  *See Docs. 10, 11.*  It is evident that this Court's order crossed paths with subsequent, and somewhat bizarre events in the state system that are not explained but which Respondents assert constitute a second procedural default.

By documents dated by Petitioner and postmarked on December 2010, but stamped received by the state clerk on July 13, 2011, Petitioner requested copies of documents from his

criminal trial record because he intended to file a petition for writ of habeas corpus. *Record Proper* at 420-25. The trial judge granted the motion on July 13, 2011, and ordered the clerk to provide Petitioner with a copy of his file and the CD of the grand jury proceedings, but did not set a deadline for any new petition. *Id.* at 417. By documents dated March 8, 2011 by Petitioner, but stamped received by the state clerk on July 27, 2011, Petitioner requested a "hearing on the merits." *Id.* at 426-27. The trial judge evidently construed his record as still having substantive habeas request in play, even though no new petition was pending before him. His summary order dated July 27, 2011, denied the request for a hearing as well as habeas relief on the merits, stating that "Defendant's Writ of Habeas Corpus is summarily denied because as a matter of law, the Petitioner is not entitled to relief." *Id.* at 428. The state docket entries end here, and nothing in the federal record shows that Petitioner filed a petition for certiorari with the New Mexico Supreme Court after this second habeas denial. *See id.* at 433; see also New Mexico v. Johnson, D-202-CR-200700625 (state docket sheet as of 1/20/12; entries after 7/27/11 order are for stenographer certificates and release of exhibits).

### C. Procedural Defaults Excused

A procedural default "may be excused if a petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Magar v. Parker,* 490 F.3d 816, 819 (10th Cir. 2007) (internal quotations and citations omitted). I start with the latter option.

### (1) Record Does Not Establish "Miscarriage Of Justice"

The "miscarriage of justice" option "is a markedly narrow one, implicated only in extraordinary cases where a constitutional violation has probably resulted in the conviction of

one who is actually innocent." *Id.* at 820; *see also, e.g., McCleskey v. Zant,* 499 U.S. 467, 494 (1991); *Coronado v. Ward,* 517 F.3d 1212, 1215-16 (10th Cir. 2008).  It is unavailable to Petitioner because he admittedly asked his wife to pull over with their daughter in the car, exited and pointed his weapon at the victim, shot the victim, and threw the murder weapon over a bridge.  A claim of actual innocence must be based on "factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623  (1998); *see also Trial Transcript 1/29/09* at 30, 39-41, 45.

Moreover,  '[t]o prevail on an actual-innocence claim, Mr. Johnson must 'support his allegations of constitutional error with ***new reliable evidence*** – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – ***that was not presented at trial***.''' *Johnson v. Oklahoma Dept. of Corrections,* 314 F. App'x. 92, 93 (10th Cir. 2008) (emphasis added) (quoting *Schlup v. Delo,* 513 U.S. 298, 324 (1995)).  None of the evidence Petitioner discusses in connection with his other claims is "new" in this sense because it is cumulative of the evidence presented at trial.  *See, e.g., Brewington v. Miller,* ___ F. App'x ___, No. 11-6168, 2011 WL 48233221, at *3 (10th Cir. Oct. 12, 2011) ("the letter was actually attached to Brewington's Motion to Dismiss filed before his trial in August 2008.  Thus, this evidence is not new.").  As such, Petitioner also fails to demonstrate that it is "'more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *Johnson,* 314 F. App'x at 93 (quoting *Schlup,* 513 U.S. at 327).

### (2)  Record Does Establish "Cause & Prejudice"

Objective evidence of record establishes that "some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 (1986).  For example, the incoming tracking log for legal mail shows

Petitioner did not receive of any legal correspondence between November 4, 2010, before the trial judge issued his first summary denial, and May 17, 2011, when Petitioner received the public defender's letter.  Conversely, the outgoing tracking log for legal mail shows, among other things, Petitioner's legal correspondence with 2nd Judicial District Court during that period. *See Doc. 13-1* at 5-9.  Thus, the federal record does support Petitioner's assertion that he was unaware his state petition had been denied until the public defender contacted him.  Despite corresponding with the court, he did not receive word that his habeas relief had been in fact denied until it was much too late to move for permission to file a belated petition.

The second procedural default arose in the bizarre circumstances noted above, where this Court had lifted the federal stay days before the state court began its second round of habeas proceedings.  In addition, those proceedings resulted in the trial judge denying a nonexistent petition.  Even if his second order was intended to have been entered nunc pro tunc in order to remedy the court-created first procedural default, that fact was not clear from the face of the order or made clear to this Court.  Nor is it clear under the state rules that Petitioner could have filed for certiorari from the denial of a nonexistent petition.  *Compare Branch v. Howard,* ___ F. App'x ___, ___, No. 11-6220, 2012 WL 8326, at *3 (10th Cir. Jan. 3, 2012) ("While Branch's procedural default may have been a product of confusion about the proper method for perfecting an appeal from the denial of post-conviction relief, we note that the OCCA went out of its way to explain to Branch how he could potentially remedy the oversight, but Branch did not take the OCCA's suggested route.").  In any event, none of these developments were court-created and external to Petitioner.

To show prejudice, Petitioner "must demonstrate that he suffered "'actual prejudice as a result of the alleged violation of federal law.'"  *Medicine Blanket v. Brill,* 425 F. App'x 751,

755 (10th Cir. 2011) (quoting *Coleman v. Thompson,* 501 U.S. 722, 750 (1991)), cert. denied, No. 11-7541, ___ S. Ct. ___, 2012 WL 117715 (Jan. 17, 2012).  But this inquiry necessarily entails review of the merits of Petitioner's claims, which the Court does in the sections that follow.  *See, e.g., Thomas v. Gibson,* 218 F.3d 1213, 1222 n.7 (10th Cir. 2000) ("we note that an exacting review of the entire record in this case leads to the inexorable conclusion that Thomas cannot demonstrate 'actual prejudice' [under Coleman].").

### D.  Unexhausted But Procedurally-Defaulted Claims Raised In Federal Motions To Amend

Petitioner's tendered amendments contain three entirely unexhausted ineffective assistance of counsel theories that have never been raised in the state courts:  (1) failure to introduce evidence that the medical examiner found cocaine in the victim's body, which would have shown that the victim "under the influence of the drug, was capable of violence and irrational acts," *Doc. 14* at 1;  (2) failure to clarify his daughter's testimony whether he pulled the gun out before or after he exited the vehicle (somewhat of a recast of the prosecutorial misconduct issue not permitted on direct appeal in ineffectiveness terms), *Doc. 13* at 13-14; and (3) failure to elicit the fact that after dropping him at the curb, his wife made a "U-turn" thereby being the one to place their daughter closer to him and the victim and the danger, in contrast to Petitioner's activities of backing the victim away from the car and shooting his gun in a direction away from his daughter, *id.* at 14-16.

Respondents assert that these unexhausted claims render the federal petition "mixed" under *Rose v. Lundy,* 455 U.S. 509, 522 (1982).  *See Doc. 16* at 13.  However, these unexhausted claims are also procedurally-defaulted, so the federal petition should not be treated as "mixed."

> Steele's unexhausted due process claim makes his a mixed petition – one containing both exhausted and unexhausted claims. Ordinarily, mixed petitions must be dismissed. . . .  If, however, it is obvious that the unexhausted claim would be procedurally

> barred in state court, we will forego the needless "judicial ping-pong" and hold the claim procedurally barred from habeas review. *Coleman v. Thompson,* 501 U.S. at ---- n. 1. . .; *Harris v. Reed,* 489 U.S. 255, 269-70 . . . (O'Connor, J., concurring).
>
> We are confident that the Oklahoma courts would apply the same procedural default rule [and he is unable to show cause for the default or actual innocence.]  Thus, his due process claim is procedurally barred.

*Steele v. Young,* 11 F.3d 1518, 1523 -1524 (10ᵗʰ Cir. 1993); *see also, e.g., King v. Chase,* 384 F. App'x 972, 975 (11ᵗʰ Cir. 2010) ("while dismissal of mixed petitions is the ordinary rule, when it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, [a district court] can forego the needless judicial ping-pong and just treat those claims now barred by state law as no basis for federal habeas relief.") (internal quotations omitted); *Bagneris v. Cain,* 254 F. App'x 351, 352 (10ᵗʰ Cir. 2007) ("As the remaining claims are exhausted, and as the sole unexhausted claim is procedurally barred, there is nothing for Bagneris to exhaust in state court.  Accordingly, the dismissal of the petition as a mixed petition was in error.") (citing *Rhines v. Weber,* 544 U.S. 269, 277-78 (2005)).

To exhaust a claim, a petitioner must "fairly present" the substance of the claim to the state courts.  *See, e.g., Picard v. Connor,* 404 U.S. 270, 278 (1971); *Medicine Blanket,* 425 F. App'x at 753 ("A fair presentation of claims need not 'invoke talismanic language . . . or cite book and verse on the federal constitution,' but it must raise the substance of the federal claim in state court") (quoting *Picard*); *Cavaness v. Roberts,* ___ F. App'x ___, No. 10-3315, 2011 WL 3018785, at *6 (10ᵗʰ Cir. July 24, 2011) (same), *cert. denied,* ___ S. Ct. ___, No. 11-7046, 2012 WL 33457 (Jan. 9, 2012).  Petitioner argues that he "exhausted" these claims in his attempt to belatedly petition the New Mexico Supreme Court.  *See Doc. 13* at 1.  But, none of the documents he submitted concerning his unsuccessful belated appeal, and nothing else in this

federal record, shows that he mentioned the substance of the claims he wanted to raise to the

New Mexico Supreme Court.  *See Doc. 13-1* at 1-17; *Doc. 13-2* at 1-39.  Petitioner also did not

raise these claims in any of his state post-conviction filings.  *See Record Proper* at 384-406.

The unexhausted claims are also procedurally-defaulted because, generally, "New

Mexico state courts will not consider any issues raised in a second post-conviction proceeding

which could have been raised in the first proceeding."  *Harris v. Williams,* 5 F. App'x 831, 833

(10th Cir. 2001).  The "narrow exception to this New Mexico waiver rule [is] when the petitioner

asserts 'fundamental error' in his trial."  *Id.* (citing *State v. Gillihan,* 86 N.M. 439, 524 P.2d

1335, 1336 (N.M. 1974)).

> We exercise our discretion to employ the fundamental error
> exception "very guardedly," *State v. Garcia,* 19 N.M. 414, 421,
> 143 P. 1012, 1015 (1914), and apply it "only under extraordinary
> circumstances to prevent the miscarriage of justice," *State v.*
> *Maestas,* 2007–NMSC–001, ¶ 8, 140 N.M. 836, 149 P.3d 933.
> Accordingly, we will use the doctrine to reverse a conviction only
> "if the defendant's guilt is so questionable that upholding a
> conviction would shock the conscience, or where, notwithstanding
> the apparent culpability of the defendant, substantial justice has not
> been served.  Substantial justice has not been served when a
> fundamental unfairness within the system has undermined judicial
> integrity." *Campos [v. Bravo],* 2007–NMSC–021, ¶ 18, 141 N.M.
> 801, 161 P.3d 846.

*State v. Silva,* 144 N.M. 815, 819, 192 P.3d 1192, 1196 (N.M. 2008).  "'If there is substantial

evidence . . . to support the verdict of the jury,'" the New Mexico courts "'will not resort to

fundamental error.'"  *State v. Reyes,* 132 N.M. 576, 590, 52 P.3d 948, 962 (N.M. 2002) (quoting

*State v. Rodriguez,* 81 N.M. 503, 505, 469 P.2d 148, 150 (1970)).  For the same reasons

Petitioner fails to establish the "miscarriage of justice" option, he also fails to establish

"fundamental error" as defined by the state courts.

These three defaulted claims stand in a completely different posture to the other

ineffective claims where "cause" can excuse the default.  After the federal proceedings were stayed to allow him to pursue state remedies further, Petitioner filed his amended state habeas petition but did not raise these claims there.  No external factor prohibited him from doing so, and he thus fails to show cause.

Moreover, the miscarriage of justice option is unavailable for the reasons set forth above. Having failed the first prong of the procedural default inquiry, the Court need not consider whether Petitioner establishes actual prejudice.  Therefore, I recommend that these aspects of the ineffective assistance of counsel claims be denied as procedurally-defaulted.  *See Magar,* 490 F.3d at 818 ("Magar's failure to avail himself of potential recourse in state courts is further complicated by the fact that it is now far too late for him to file. . . .  The Supreme Court has explained that if state court remedies are no longer available because the prisoner failed to comply with the deadline for seeking review, the prisoner's procedural default functions as a bar to federal habeas review.") (citing, among other cases,  *Woodford v. Ngo,* 548 U.S. 81, 92-93 (2006) and *Gray v. Netherland,* 518 U.S. 152, 162 (1996)).

Alternatively, for the reasons discussed later, these unexhausted claims would fail on the merits for the same reasons his other ineffectiveness claims fail to satisfy the Strickland standards.  *See, e.g., Lambrix v. Singletary,* 520 U.S. 518, 525 (1997); 28 U.S.C. § 2254(b)(2).

## IV.  Fourth Amendment Claim

Petitioner was represented counsel at the trial level and throughout direct appeal.  His Fourth Amendment Claim:  rests in part on a missing portion of the trial record and a procedural default not raised by Respondents; implicates potential ineffective assistance of counsel, an exception to the noncognizability doctrine; and ultimately has no merit.

### *A. Further Expansion Of Record Unnecessary*

The first claim in the initial federal petition asserts that the trial court erred in denying Petitioner's motion to suppress, in violation of the Fourth Amendment. *See Doc. 1* at 7-11. Trial counsel filed a written motion "in limine" to exclude Petitioner's interview with the police as "involuntary," but the Court is unable to locate the motion in the Record Proper. Also, Respondents did not submit the transcript or audiotape of Petitioner's interview or the advice of rights waiver form he signed. But the record reflects that before rendering his suppression ruling, the trial judge was aware of the motion, privately listened to the audiotape, read the transcript of the tape and the waiver form, and heard the arguments of counsel. *See Trial Transcript 1/27/09* at 12-36. Though the prosecution played a redacted version of the audiotape of the interview for the jurors, the court reporter did not transcribe that portion the trial. *See Trial Transcript 1/28/09* at 82-84, 101-02.

The trial judge considered trial counsel's "in limine" request to be "tantamount to a suppression [motion]" and characterized it as "being a motion to suppress or exclude the State from utilizing the Defendant's statement to police as not being freely and intelligently made pursuant to the *Miranda* decision." *Trial Transcript 1/26/09* at 13. As such, he found that "the State would need to make a predicate showing that in fact the statement was knowingly, intelligently made and it was voluntary and not coerced in any way." *Id.* at 14. And, even though defense counsel did not make her position known during the hearing, substantial portions of the transcript were read into the record during testimony. From those verbatim excerpts and the questions defense counsel asked of the witness, the Court finds the federal record is sufficient for a complete analysis, and no need to further expand it.

### B.  Testimony & Trial Judge's Suppression Ruling

The detective's testimony revealed that Petitioner was crying "a lot" and "very upset" during their interview, so much so that at one point she asked if he was okay.  *See id.* at 16, 28. When the detective reviewed the waiver form with Petitioner and read him all of his rights, and asked him if he understood, he initially did not give an "audible response" and then said:  "Any questions about any of this stuff?  I don't know exactly what to do or what to say, or anything. "I'm just -- I mean --."  *Id.* at 21-22.   The following colloquy between Petitioner and the detective then ensued:

> Question:  Okay.  So, we'll just start out by any questions about what I just read right here?
>
> Answer:  I understand --
>
> Question:  You understand?
>
> Answer:  Yes.
>
> Question;  Okay. So what I'm going to let you do and initial at these lines.  And, my (sic) initialing, all it's saying is that you understand what I just read to you.  I'm going to go ahead and let you keep the pen for now.  Right here it says, 'I have been told my constitutional rights.  I have read my constitutional rights.  And, I understand my constitutional rights.'  If you agree with all of those, go ahead and initial here.  Okay.  [']I am willing to talk to you and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me.  No pressure of any kind has been used against me.[']  So, if you want to talk to me without an attorney present, go ahead and initial right here and then sign your name, right here.
>
> Answer:  I don't know 'cause -- I don't know.  Oh, gosh.
>
> Question:  And, you know, Paul, unfortunately I can't tell you -- you know -- what to do.  Obviously, you know, you having an attorney is definitely your right.  So, you know, if that's what you choose to do, that's okay.  But, if you want to talk to us without an attorney present, that's your choice.  So, that's something that

you're going to have to decide.

Answer:  Oh, God. I don't have an attorney.

Question:  Do you understand what I read to you, that if you can't afford -- if you can't afford a lawyer, and want one, a lawyer will be provided for you, if that is your desire.

Answer:  How long will it take?

Question:  How long will it take?

Answer:  Yeah.

Question:  I can't give you like an exact time, but if you choose to have an attorney present, what we'll do, is we'll stop the attorney. [interjection by detective on stand:  I think that should actually say the interview].  We won't talk to you.  And, then, you'll have a choice (sic) to get an attorney.  So, it's just kind of a matter of you -- you know -- finding one and calling one and talking to one.

Answer:  Oh, God. I don't know what to do.

Question:   And, you can also keep in mind that if you start answering questions for us, and you want to stop, and you decide you want an attorney at that point, you can do that too.  And if you want to, you can read this last sentence.  And, that's what it states.

Answer:  Okay.

Question:  Go ahead and sign your name right here."
[Later established that Petitioner had initialed the individual sections and signed his name at this point].

Question:   Paul, as you know, we're here because of a shooting incident . . . -- we basically know what happened, according to other people.  What I would like to do is have a chance to talk to you, so that you can tell me your side -- *if you choose to do that.* So, if you want to, you can pretty much just start by telling me what you were doing yesterday.

*Id.* at 22-25 (emphasis added); *see also id.* at 26, 30-31, 34.  When the Court asked the detective

if Petitioner ever affirmatively stated that he wanted to waive his rights and speak, she could not

recall him ever doing so, but she did consider his act of signing his name to the waiver in light of

their preceding conversation as an affirmation of the same. *Id.* at 30-31.

The detective testified that though Petitioner was very upset and crying, she could not smell alcohol on him and he did not appear to be under influence of any drugs or alcohol. *Id.* at 16. The trial judge credited this testimony and specifically found that "although Mr. Johnson was upset, he wasn't under the influence of alcohol or drugs as much as the detective could tell." *Id.* at 32.

After his initial review of the materials, the trial judge considered the issue a "pretty close call" because "it's certainly not a classic waiver, and that's for sure. The officer continues to persist and then the Defendant just kind of says, "okay." And then the statement takes place." *Trial Transcript 1/27/09* at 4. But he subsequently denied the motion to suppress reasoning in full:

> I'm going to find that the Defendant's statement was given freely and voluntarily and that it was not induced by threat or promise. Moreover, that it was taken after Defendant was advised of his Fifth Amendment right and privilege to remain silent, and that the Defendant knowingly and intelligently waived his rights and gave the statement to the officer in this matter.

*Id.* at 82.

In light of the suppression ruling, the prosecution played a redacted version of Petitioner's statement for the jurors and they were later instructed that before they could consider Petitioner's statement to the police, it had to "determine that the statement was given voluntarily . . . freely made and not induced by promise or threat." *Record Proper* at 249.[7] As such, even though the trial judge already determined Petitioner was not intoxicated for suppression purposes, Petitioner's trial testimony emphasized his mental state, including his claim that he

---

[7] They were not given a special verdict on the question. *See Record Proper* at 254-61.

was drunk and high:

> That night, I was in pain.  I was hurt.  I was devastated.  I was
> confused.   You know, I kept going in my head, over and over, you
> know, what happened.   What happened.   You know I'm like,
> "what do I need to do?"  And I kept asking myself over and over,
> 'What do I need to do?"  And I was just scared.  I didn't know
> what to do, you know.

* * * * *

> . . . I didn't sleep at all.  I stayed up and I drank and smoked crack
> all night long [even though I] never drink.

* * * * *

> I kept crying all night long . . . thinking about what happened.

* * * * *

> I told them [on the 911 call], "My name was Paul Johnson.  I want
> to report a homicide that happened yesterday."  You know.  I just
> told them that I need help.  I don't know what to do, you know,
> and he asked me, he said, "Well, what happened?   What
> happened?" I said, "you know, I shot a man.  I didn't man to shoot
> him, but I shot him, you know."

* * * * *

> When the police arrived, I was just -- I started getting sick.   I
> started shaking all over.  I couldn't move.  I was stunned.  I just
> couldn't do anything, you know.  And it came to a point where my
> body started -- I just started getting sick, you know, and I heard the
> police kept calling my name and I kept yelling at them, telling
> them I couldn't move."

* * * * *

> [His state of mind when he gave his statement] . . . was messed up.
> You know, I was disturbed and I was drunk.  I was high, you
> know.

* * * * *

> [He talked to the detective without an attorney present] [b]ecause I
> didn't know what to do, I just don't know what to do.  I know I

was wanting some kind of help, but -- and I was fighting with that in my mind, you know.   I just don't know what to do and I thought the police would, you know, comfort me in that and help me in this situation.

[Though he had options to flee with money and contacts, he knew it was right to turn himself in.]  Yes, ma'am.

*Trial Transcript 1/29/09* at 47-54.

### C. Court Of Appeals' Bifurcated Analysis

Respondents take the position that Petitioner's claim is exhausted because it was raised on direct appeal.  *See Doc. 16* at 11, ¶ 9 ("Petitioner has exhausted through direct appeal the grounds contained in the Petition, Doc. 1.").  That is certainly true for the "voluntariness of the waiver" aspect of his claim.  However, appellate counsel also attempted to raise an "invocation" argument, and Petitioner repeats the same here.  I cannot overlook that the Court of Appeals considered the analysis for voluntary waiver and invocation to be separate, and that any argument based on invocation of the right to counsel was procedurally-defaulted.

The Court of Appeals was of the view that trial counsel only raised waiver arguments.  It refused to consider appellate counsel's arguments that "under *Miranda,* a court is to determine whether the defendant expressed a desire to remain silent" or whether "Mr. Johnson invoked his right to remain silent when he brought up the need for counsel and was unable to decide what the do with relation (sic) to requesting counsel (sic)," thereby requiring the officers to stop the interrogation.  *Doc. 16-1* at 45.  It reasoned:

> To the degree [Petitioner] seeks to make arguments about whether the district court should have suppressed the statements because Defendant invoked his right to counsel, such that the questioning should have ceased, this is a separate argument requiring a separate factual basis and a separate legal analysis.  This argument was not made in the docketing statement and Defendant does not indicate that it was preserved below.

-23-

*Record Proper* at 373.[8]  Indeed, the Supreme Court holds  that "[i]nvocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together," because once invocation occurs questioning must cease.  *Smith v. Illinois,* 469 U.S. 91, 98 (1984); *see also Burghuis,* ___ U.S. at ___, 130 S. Ct. at 2268 (Justice Sotomayor, dissenting) ("The questions are related . . . .  A suspect may at any time revoke his prior waiver or rights . . . or . . . guard against the possibility of a future finding that he implicitly waived his rights . . . by invoking the rights and thereby requiring the police to cease questioning.").  Appellate counsel ignored the default ruling in the petition for certiorari, and reargued the merits that the circumstances indicated Petitioner was invoking his "right to remain silent when he brought up the need for counsel and was unable to decide what to do with relation (sic) to requesting counsel."  *Doc. 16-2* at 7.

The only argument the Court of Appeals considered was whether Petitioner's statement was involuntary due to intoxication.  It rejected the claim because absent coercion, Petitioner's mental state was only relevant to the "question of how much weight jury should give the defendant's statements."  *Record Proper* at 374.  It refused to conclude that "police questioning of someone who did a lot of drinking . . . is tired, emotional and stressed constitutes a due process violation" because of an absence authority due to the fault of counsel.  *Id.* at 375.

---

[8]  In characterizing the docketing statement as raising only the voluntariness based on intoxication, see *Record Proper* at 373, the Court of Appeals cited the factual section of the docketing statement where it provides:

> In a recorded statement, detective Chavez read Paul Johnson his Miranda rights.  Paul laments that he does not have an attorney, specifically crying 'Oh God.  I don't know what to do.'  Throughout the tape, which the jury heard, Paul Johnson sobs and speculates as to getting a lawyer as he describes his night as drunken, sleepless and stress riddled.  This testimony indicated that Paul was not acting voluntarly but rather was in a state of emotional discord sufficient to indicate that his statement was not the product of conscious reflection or will.

*Doc. 16-1* at 23.

Petitioner's attorneys had not cited any such authority, so the court "assume[d] [none] exists."
*Id.*; *see also Doc. 16-1* at 45-46 (appellate counsel's argument that Petitioner's statement was not
voluntary because "totality of the circumstances" is test for determining coercion, and Petitioner
"was questioned after he had been drinking" without the officers doing "anything to verify that
[he] was sober enough to give a statement.").

### D.  The Federal Claim

The federal petition raises both voluntariness and invocation and blurs them, while
emphasizing intoxication was consistent with Petitioner's trial testimony.  Specifically,
Petitioner argues that because of his "drunken and stressed out . . . confused state" of mind,
coupled with his statements that he did not have an attorney or know what to do, he cannot be
held to have clearly waived his rights to remain silent or to the presence of an attorney:

> The lack of a clear "yes" or "no" was an obvious indicator
> that [Petitioner] either did not fully understand his rights, or . . .
> was too confused to make up his mind.  Either way police should
> have ceased the interrogation at this time, because any statements
> made by him, after his decision as to his rights, could not meet the
> scrutiny of the *Miranda* ruling.

*Doc. 1* at 9.  He also points to the fact that the trial judge initially characterized his suppression
decision as a "close call."  *Id.* at 10.

### (1) Cognizability & Procedural Default

It is well-settled that a federal court cannot grant habeas relief for a Fourth Amendment
claim if the State "provided an opportunity for a full and fair litigation" of that claim "at trial and
on direct review."  *Stone v. Powell,* 428 U.S. 465, 482, 494 & n.37 (1976).  It is equally well-
settled that ineffective assistance of counsel is an exception to the *Stone* rule.  *Kimmelman v.
Morrison,* 477 U.S. 365, 375, 382–83 (1986).  Here, Petitioner did not have a full opportunity to
litigate his claims on direct review since the Court of Appeals was unwilling to consider certain

intoxication arguments because of appellate counsel's failure to cite cases, and unwilling to consider an invocation argument at all because trial counsel failed to raise it and appellate counsel failed to address whether it had been preserved.

Ineffective assistance of counsel can be the basis to excuse a procedural default, so long as the ineffectiveness claim itself is also exhausted and not procedurally-defaulted. *See, e.g., Edwards v. Carpenter,* 529 U.S. 446, 451–52 (2000); *Welch v. Milyard,* 436 F. App'x 861, 866 (10th Cir. 2011) (and cases cited therein); *Carter v. Werholtz,* 430 F. App'x 702, 707-08 (10th Cir. 2011) (same).  Petitioner has not raised a claim his attorneys were ineffective in this regard and would be foreclosed from doing so.  As noted earlier, New Mexico state courts generally will not consider any issues raised in a second post-conviction proceeding absent "fundamental error" and given the substantial evidence in support of the jury verdict, Petitioner does not meet that standard.  Because Petitioner did not present any "ineffective-assistance-of-counsel-as-cause" claims in his post-conviction petitions and cannot do so now, his "invocation" and "involuntariness-due-to-intoxication-alone" arguments are procedurally defaulted.

### (2) Alternatively, Fourth Amendment Claim Is Without Merit

Even if Petitioner's Fourth Amendment claims are cognizable and not procedurally-defaulted, whether raised as an ineffectiveness or stand-alone Fourth Amendment claim, his arguments are utterly without merit.[9]  This is the case regardless of whether the Court reviews the claims under AEDPA deference or *de novo*.

---

[9]  To determine whether Petitioner's attorneys were ineffective with regard to the Fourth Amendment claim requires that this Court evaluate the underlying merits of the Fourth Amendment claim.  "A Sixth Amendment claim based on counsel's failure to competently litigate a Fourth Amendment issue is a cognizable ineffective assistance of counsel claim, notwithstanding the rule of *Stone* [and analyzed] under the familiar standard established in *Strickland.*"  *Sanchez v. Ulibarri,* 308 F. App'x 280, 284 (10th Cir. 2009).  "In order to determine if prejudice occurred, we review the merits of Mr. Dennis' underlying or constitutional claims. . . .   If those claims lack merit, Mr. Dennis cannot claim prejudice from his attorney's failure to raise them at trial or on direct state appeal."  *Dennis v. Poppel,* 222 F.3d 1245, 1250 (10th Cir. 2000).

In *Davis,* the Supreme Court held that a suspect must invoke the *Miranda* right to counsel "unambiguously" and equivocal statements, like Petitioner's, do not require the police to cease questioning or clarify exactly whether the suspect wants to invoke the right or not. *See, e.g., Berghuis v. Thompkins,* ___ U.S. ___ , ___, 130 S. Ct. 2250, 2259-60 (2010); *Davis v. United States,* 512 U.S. 452 (1994). *Berghuis* extended the same rule to the right to remain silent. *Berghuis,*130 S. Ct. at 2260. The Supreme Court decided *Berghuis* on June 1, 2010, one day before the New Mexico Supreme Court denied certiorari from direct appeal. As such, even if it announced a "new rule" under *Teague,* it applies to Petitioner's case.[10] Because Petitioner's statements about an attorney were ambiguous at best, and he "did not say that he wanted to remain silent or that he did not want to talk with the police," this Court cannot conclude that he "invoked his right to cut off questioning." *Id.* (internal quotations and citation omitted). Thus, the "invocation" aspect of his claim is without merit.

As for whether his waiver of rights was voluntary, the "inquiry has two distinct dimensions: . . . waiver must be voluntary in the sense that is was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and . . . made with the full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (internal quotations and citations omitted). However, Petitioner did not testify or even suggest that the officers coerced him in any way. To the contrary, he admitted on cross-examination that they did not threaten him or demand that he speak with them, and gave

---

[10]  *See, e.g., Danforth v. Minnesota,* 552 U.S. 264, 266 (2008) ("New constitutional rules announced by this Court that place certain kinds of primary individual conduct beyond the power of the States to proscribe, as well as "watershed" rules of criminal procedure, must be applied in all future trials, all cases pending on direct review, and all federal habeas corpus proceedings. All other new rules of criminal procedure must be applied in future trials and in cases pending on direct review, but may not provide the basis for a federal collateral attack on a state-court conviction."); *Beard v. Banks,* 542 U.S. 406, 411 (2004) ("State convictions are final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.") (internal quotations and citation omitted).

him the choice whether or not to talk to them. *Id.* at 70-71. Likewise, Petitioner's federal Fourth Amendment claim does not dispute that he received *Miranda* warnings, was aware of his rights, and initialed and signed the waiver. Neither here nor in the state proceedings does he argue that the officers coerced him in any way. *See Doc. 1* at 8-9; *Trial Transcript 1/29/09* at 46-49, 53, 70-71. Petitioner's concession that there was no coercion forecloses the first dimension and his concession that he was fully aware of his rights forecloses the second. In addition, although the Court of Appeals rejected the "involuntariness-due-to-intoxication-alone" argument for lack of citation to authority, Tenth Circuit and other court cases have discussed the issue. However, none flatly hold that intoxication alone is sufficient to justify suppression and this Court has not found any Supreme Court decision that holds to the contrary. [11]

---

[11] *See, e.g., Cardenas v. Hartley,* ___ F. App'x ___, No. 11-1301, 2011 WL 5865885, at *2 (10th Cir. Nov. 23, 2011) ("Mr. Cardenas . . . claims that he was suicidal and crying for much of the time he was questioned by police, so this made him unable to voluntarily waive his rights. . . . Although Mr. Cardenas was under the influence of certain substances, the Colorado Court of Appeals noted a complete lack of evidence suggesting his statements were obtained by threatening or coercive means. . . . Rather, Mr. Cardenas called the police and confessed of his own volition. . . . Further, merely because Mr. Cardenas was intoxicated and distraught, . . . does not undermine the voluntariness determination based upon the totality of the circumstances. . . . Nothing suggests that there were any problems with the Miranda procedures employed by officers, or that the state court's determination was "contrary to, or involved an unreasonable application of, clearly established Federal law."); *United States v. Burson,* 531 F.3d 1254, 1260 (10th Cir. 2008) ("The mere fact of drug use does not render a defendant incapable of waiving his rights. . . . 'The state of intoxication does not automatically render a statement involuntary.' . . . "This court, though, has declined to adopt a per se rule of involuntariness founded solely on intoxication."); *Elliott v. Williams,* 248 F.3d 1205, 1212 (10th Cir. 2001) ("Under *Connelly,* coercive police activity is a necessary predicate to a finding that a confession is not voluntary within the meaning of the due process clause. . . . The New Mexico Court of Appeals found there was no evidence in the record to support a finding of police misconduct and concluded Elliott was not denied due process. Although Elliott had taken heroin, his ability to give a voluntary statement was not impaired. The state court's determination that the statement was voluntary and admissible was not so clearly incorrect that reasonable jurists considering the question would be of one view that the ruling was incorrect. . . . Therefore, Elliott is not entitled to relief under 28 U.S.C. § 2254"); *Small v. Copeland,* No. CV-00-112-S-ELJ, 2009 WL 3199649, at *22, n. 4 (D. Idaho Sept. 30, 2009) ("While it is true that a waiver of one's *Miranda* rights must be done intelligently, knowingly, and voluntarily . . . the Supreme Court has never said that impairments from drugs, alcohol, or other similar substances can negatively impact that waiver. . . . intoxication does not per se mean that a statement is not knowing, intelligent, or voluntary") (internal quotations and citations omitted).

# V.  Child Abuse Conviction Claims

As on direct appeal, Petitioner challenges the sufficiency of the evidence for his conviction for negligently endangering his daughter when he confronted the victim.

### A.  Sufficiency Of Evidence Standard

As the Supreme Court recently reiterated in a per curiam opinion, a sufficiency of the evidence review in federal habeas is doubly deferential and

> The opinion of the Court in *Jackson v. Virginia* . . . makes clear that it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.  What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was "objectively unreasonable."  *Renico v. Lett* . . .
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.
>
> * * * * *
>
> . . . *Jackson* says that evidence is sufficient to support a conviction so long as "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." . . .  It also unambiguously instructs that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." . . . When the deference to state court decisions required by § 2254(d) is applied to the state court's already deferential review, *see Renico,* . . . there can be no doubt of the Ninth Circuit's error below.
>
> * * * * *

> In light of the evidence presented at trial, the Ninth Circuit plainly erred in concluding that the jury's verdict was irrational, let alone that it was unreasonable for the California Court of Appeal to think otherwise. . . . Doubts about whether Smith is in fact guilty are understandable. But it is not the job of this Court, and was not that of the Ninth Circuit, to decide whether the State's theory was correct. The jury decided that question, and its decision is supported by the record. FN*
>
>> FN* The dissent's review of the evidence presented to the jury over seven days is precisely the sort of reweighing of facts that is precluded by *Jackson* . . . and precisely the sort of second-guessing of a state court decision applying *Jackson* that is precluded by AEDPA, § 2254(d).

*Cavazos v. Smith,* ___ U.S. ___, ___, 132 S. Ct. 2, 3-4, 6 (2011).

The State alternatively charged defendant with "intentional" and "negligent" child abuse in violation of N.M. Stat. Ann. § 30-6-1, but both have as a common element that Petitioner "caused" his child "to be placed in a situation" that "endangered" her "life or health." To find he acted with "reckless disregard," the jury was required to show that Petitioner's conduct "created a substantial and foreseeable risk." *See Record Proper* at 3, 239, 241.[12] The prosecutor argued that Petitioner created a substantial and foreseeable risk by taking his daughter "to a killing . . . a shooting," knowing that was "a substantial and foreseeable risk," but that he "disregarded that risk [and] got out of that car with the gun anyway." *Trial Transcript 1/29/09* at 108. Trial counsel countered with the argument that Angelique was "buckled . . . safely in the car," but did not mention in her closing argument or clarify through her questions of Petitioner exactly how far the car was from the shooting.

---

[12] *See also* N.M. Stat. Ann. § 30-6-1 ("D. Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be: (1) placed in a situation that may endanger the child's life or health"); NM UJI 14-604 ("[To find that _____ (*name of defendant*) acted with reckless disregard, you must find that _____ (*name of defendant*) knew or should have known the defendant's conduct created a substantial and foreseeable risk.").

### B.  State Court Decisions

On direct appeal counsel raised the sufficiency of the evidence claim in the docketing statement and argued that the "only testimony that in any way indicated any impact on the child" was from Petitioner's mother-in-law Mary Helen Sanchez, who admittedly did not like Petitioner, and who testified that "Angelique had done poorly in school after the shooting." *Doc. 16-1* at 22; *see also id.* at 25-27.   In objecting to the proposed summary disposition, appellate counsel noted that trial counsel and Petitioner related different versions of how far the child was from the shooting.  "Trial counsel [said] that the shooting occurred a few feet from the car where Angelique was sitting.  Mr. Johnson, however, has clarified that the shooting actually occurred at least 50 yards from the car and Angelique was not in any danger." *Id.* at 42.  Citing cases that apply the *Jackson* sufficiency standard,[13] appellate counsel argued that, unlike the case where the child was standing behind the person being threatened with a gun, "Angelique was a safe distance away, with the danger being simply "'theoretical'" rather than "'substantial.'"[14]

The Court of Appeals applied the *Jackson* standard and affirmed the conviction, emphasizing that state law turns on proximity to potential gunfire as the key to the endangerment inquiry, but refused to entertain appellate counsel's assertions about distance:

> "[P]roof of child endangerment is sufficient for a conviction if a defendant places a child within the zone of danger and physically close to an inherently dangerous situation" *State v. Trossman,* 2009-NMSC-034, ¶ 20, 146 N.M. 462, 212 P. 3d 350. In this case, there was evidence that Defendant's wife and daughter were sitting in the car while Defendant got out, had an argument with the victim on the street, and shot the victim in the head.  [DS 2]   At the time Defendant confronted the victim,

---

[13]  *See Doc. 16-1* at 46 (citing *State v. Sutphin,* 107 N.M. 126, 130-31, 753 P.2d 1314, 1318-19 (1988), and *State v. Graham,* 137 N.M. 197, 200, 109 P.3d 285, 288 (2005)).

[14]  *See Doc. 16-1* at 47 (quoting *State v. Chavez,* 146 N.M. 434, 440, 211 P.3d 891, 897 (2009), which in turn quotes UJI 14-604) (original emphasis deleted).

Defendant believed the victim to be armed with either a gun or a knife and believed that the victim might want to shot or stab Defendant. [DS 2].

In a previous case reviewing sufficiency of the evidence of child abuse by endangerment, the New Mexico Supreme Court held that a defendant's conduct created a substantial and foreseeable risk of harm sufficient to support a conviction of child abuse when the defendant pointed a gun at someone who was near a child. *See State v. McGruder,* 1997-NMSC-023, ¶¶ 37-38, 123 N.M. 302, 940 P.2d 150. In contrast, this Court has held that when a defendant tried to kill a child's mother while the child was in a different part of the house, there was not a substantial and foreseeable risk of harm to the child to support a conviction for child abuse. *See State v. Trujillo,* 2002-NMCA-100, ¶¶ 19-20, 132 N.M. 649, 53 P.3d 909. These two cases reflect the general rule that the child must actually be in the zone of danger in order to support a conviction for child abuse.

In Defendant's case, it appears that there was sufficient evidence from which a jury could conclude that the child and the vehicle were in close proximity to an altercation that Defendant expected to lead to gunfire, either from the victim, from Defendant, or both, and which did in fact lead to gunfire from Defendant. Although there is no evidence that, as in *McGruder,* Defendant shot in the direction of the child, we nevertheless conclude that an altercation involving gunfire is sufficiently dangerous and unpredictable that Defendant placed his child in the zone of danger, thereby exposing her to a substantial and foreseeable risk of harm. Defendant's memorandum in opposition suggests that the child was not in the zone of danger because, in a conversation with Defendant, appellate counsel was informed that the shooting occurred at least fifty yards from the car. [MIO 4] However, Defendant also notes that trial counsel indicated to appellate counsel that the shooting occurred only a few feet from the car. [MIO 4] As neither of these post-trial representations is framed in terms of what was or was not introduced at trial, we do not rely on them in reviewing the sufficiency of the evidence (although we recognize that trial counsel's representation, along with the fact that trial counsel chose not to raise the issue of the car's proximity to the shooting in the docketing statement do reflect trial counsel's determination that this is not a viable issue based on the evidence introduced at trial). And as Defendant has not described the evidence actually introduced at trial in a manner that would undermine the proposed conclusion in our notice that there was substantial evidence from which a reasonable factfinder

could determine that Defendant's child was close enough to the altercation to be in danger, we adhere to that conclusion. *See Hennessy v. Duryea,* 1998-NMCA-036, ¶ 24, 124 N.M. 754, 955 P.2d 683 ("Our courts have repeatedly held that, in summary calendar cases, the burden in on the party opposing the proposed disposition to clearly point out errors in fact or law.").

We recognize that this Court has held that there was no substantial and foreseeable risk to a child when a defendant left his child in a car with the child's mother, ten to fifteen feet from the defendant's drug transaction. *See State v. Roybal,* 115 N.M. 27, 34, 846 P.2d 333, 340 (Ct. App. 1992). However, the nature of the interaction in that case was different, as there was no evidence in *Roybal* that the defendant had any reason to believe that it would become violent, and in fact, it did not. *See id.* Here, in contrast, there was evidence from which a jury could conclude that Defendant knew or should have known that there would be gunfire as a result of his interaction with the victim and that the child was dangerously close to the gunfire.

*Doc. 16-1* at 54-59.

As with the Fourth Amendment issue, Respondents do not mention this procedural default, and save for a conclusory mention that "cumulative error" should undermine a court's confidence in the child abuse conviction, *see Record Proper* at 405, Petitioner did not mention his attorneys' deficient conduct with respect to this issue until the "U-turn" claim he wants to add to his federal petition and which I have found procedurally-defaulted, see supra, § III.D. Because the claim is plainly without merit, even in the absence of a complete record, I will forego any further procedural discussion.

### C. Even Assuming Car Was 50 Yards Away From Victim, Evidence Was Sufficient

Petitioner cites his testimony at trial where he "pointed to 2 points on the chart, one showing where the car was parked, the other where the shooting occurred. In chart inches, the distance measured, approximately 50 yards of actual distance." *Doc. 1* at 12. The exhibits that would show proximity in terms of distance are not in the federal record, were not among the

-33-

items the Court of Appeals reviewed before making its decision, and evidently not something

appellate counsel reviewed before making her arguments in the memorandum in opposition.[15]

Nor did Angelique, her mother, or Petitioner testify how far the car was from the shooting.

Petitioner marked locations on the defense demonstrative exhibit, but did not specifically testify

about distances. *See Trial Transcript 1/29/09* at 36-38, 41-42, 44. Angelique pointed out on the

state exhibit where the car was parked and the direction Petitioner and the victim were moving,

but did not mention distance. *See Trial Transcript 1/27/09* at 113-16. She also testified,

however, that after hearing the shot, she turned to look out of the window and could see the

victim lying "on the ground on the corner." *Id.* at 118. Petitioner's wife testified that the child

was belted in her seat behind the passenger, the windows were up, Petitioner and the victim were

backing away from the car, and the gunshot they heard was a "very . . . faint[]" sound. *See Trial*

*Transcript 1/28/09* at 30-31, 39-41. She also testified, however, that she never would have

stopped the car if she knew a murder would ensue "[n]ot with my daughter . . . of course not," *id.*

at 41, and that she pleaded guilty to negligent child abuse "because my daughter was in danger at

the place that we were at. She was in danger and I felt that I had placed her in a – you know a

dangerous situation," *id.* at 42.

I will assume the car was 50 yards from the shooting, the shot was fired away from the

direction of the car, and if the car was closer than that, the fault lies with Marie making a U-turn

and reparking the car. The result of the *Jackson* sufficiency inquiry is the same under a *de novo*

or the doubly-deferential AEDPA standard. From the exhibits and testimony, the jurors saw

---

[15] State Exhibit 4 is described simply as a "photo" on the exhibit list, *Record Proper* at 219, and by
Petitioner's testimony a "picture of the mission and the church," with the car "way farther down [the]
street," *Trial Transcript 1/28/09* at 58. The same is true of defense Exhibit B, described on the exhibit list
as a "diagram," *Record Proper* at 219, and in comments as a ""demonstrative aid . . . to show the jury sort
of the bigger picture than we've seen," *Trial Transcript 1/29/09* at 36, and as a "satellite photo," *id.* at 41.

where the car was located in relationship to the shooting, and heard Marie's testimony that the

situation was dangerous.  Even assuming that distance was in fact 50 yards away, any rational

juror could have reached the same conclusion as Angelique's mother – 50 yards was not

sufficient in that situation to take the child out of the zone of danger.  The Court of Appeals,

while emphasizing proximity in terms of distance, also plainly indicates that state law imposes

no bright-line yardage rule beyond which the zone of danger ceases as a matter of law under all

circumstances.   Moreover, as the Court of Appeals noted, the undisputed evidence is that

Petitioner chose to stop the car, get out, pulled a gun on a person known by him to carry a gun,

engaged in a confrontation on the public areas of the street, amidst people who were friends of

the victim and other bystanders.  Thus, even if Marie moved the car closer to where Petitioner

was confronting the victim, any rational juror could conclude that Petitioner's independent

actions negligently triggered the situation where his child was in a dangerous situation,

notwithstanding that the child was in the back of the car and not in Petitioner's direct line of fire.

## VI.  Claims Concerning Second Degree Murder Conviction

To convict Petitioner of second-degree murder, the jurors had to find that Petitioner "did

not act as a result of sufficient provocation" and that he "did not act in self defense."  *Record*

*Proper* at 231.  The instructions defined "sufficient provocation" as

> any action, conduct or circumstances which arouse anger, rage,
> fear, sudden resentment, terror or other extreme emotions.  The
> provocation must be such as would affect the ability to reason and
> to cause a temporary loss of self control in an ordinary person of
> average disposition.   The "provocation" is not sufficient f an
> ordinary person would have cooled off before acting.

*Id.* at 233.  The instructions defined the elements of self-defense, as requiring the victim to have

caused an appearance of danger that put Petitioner in fear, and to which to which he reasonably

responded.  The jurors were also specifically instructed that

> A person who is threatened with an attack need not retreat. In the exercise of his right of self-defense, he may stand his ground and defend himself.  [and]

> Self-defense is not available to the defendant if he started the fight or agreed to fight unless:
> 1.   The defendant was using force which would not ordinarily create a substantial risk of death or great bodily harm; and
> 2.   [The victim] responded with force which would ordinarily created a substantial risk of death or great bodily harm.

*Id.* at 236-37.

Petitioner raises several claims that he maintains would have changed the jurors' view on the self-defense issue.

### A.  Prosecutorial Misconduct

Petitioner contends the Court of Appeals erred in denying appellate counsel's request to amend docketing statement to raise a claim of prosecutorial misconduct.  He asserts that the prosecutor suborned "false evidence" by eliciting Angelique's testimony that he pulled out the gun while they were inside the car and before he got out, as opposed to her contradictory initial responses during an interview that he pulled it after walking over to the victim, he pulled it when he was "outside" the car, and she "d[id]n't know."  *See Doc. 1* at 18; *Doc. 16-1* at 42.[16]

Even if reviewed *de novo*, Petitioner's claims of error and prosecutorial misconduct should be rejected for several independent reasons.  Foremost, contrary to Petitioner's

---

[16]   Appellate counsel asked to amend trial counsel's docketing statement to include the claim that the "prosecutor committed misconduct in his questioning of Mr. Johnson's daughter and in his failure to preserve evidence." *Doc. 16-1* at 39.  The claim she wanted to add was that the prosecutor, knowing Angelique made two inconsistent statements about the gun, "failed to highlight" those inconsistencies when he questioned her "thus hiding from the jury that Angelique might be misrepresenting the facts." *Id.* at 48.  As such, the prosecutor "failed to do justice" by not highlighting "exculpatory facts." *Id.* at 49.  For the proposition that the prosecutor's interest in a case is not to "win" but to ensure "justice" is done, appellate counsel relied on a state decision that in turn quotes *Berger v. United States,* 295 U.S. 78, 88 (1935).  *See id.* (citing *State v. Cummings,* 57 N.M. 36, 39, 253 P.2d 321 (1953)).  The Court of Appeals denied amendment because the issue was "not sufficiently viable," but did not explain why it reached that conclusion.  *See id.* at 58.

recollection of her testimony, Angelique testified on direct examination that she saw her father

pull out the gun "[w]hen he got **out** of the car." *Trial Transcript 1/27/09* at 116 (emphasis

added); *see also id.* at 125 (cross-examination: Q.  "So when your dad got out of the car, you

were able to see the gun outside of his hand?  A.  Yes.").  That is exactly what Petitioner

admitted he told the police --  he had the gun in his hand when he got out of the car.  *See Trial*

*Transcript 1/29/09* at 77-78 ("'So it was in your hand when you got out of the car?' . . . Yes").

        Second, even assuming a discrepancy, Petitioner cannot "establish that the prosecutor

knowingly presented false testimony at the second trial, let alone that the testimony was false."

*Ochoa v. Workman,* ___ F. App'x ___, No. 02-6032, 2011 WL 6000510, at *10 (10th Cir. 2011)

(citing *Van Woudenberg v. Gibson,* 211 F.3d 560, 569 (10th Cir. 2000), and *Romano v. Gibson,*

239 F.3d 1156, 1175 (10th Cir. 2001)).  "Discrepancies in testimony are common, and can

generally be explained as resulting from human failings short of intentional lying."  *United*

*States v. Frazier,* 429 F. App'x 730, 734  (10th Cir. 2011).  Inconsistencies do not establish

"perjury" and, instead, present credibility issues for the jurors.  *See Caldwell v. Thaler,* 770 F.

Supp. 2d 849, 863 -864 (S.D. Tex., 2011) ("Conflicting or inconsistent testimony is insufficient

to establish perjury. . . .  Rather, contradictory trial testimony merely establishes a credibility

question for the jury.") (internal quotations and citations omitted); *Montano v. Galaza*, No.

EDCV 07-261 JVS CW, 2011 WL 5387382, at *14 (C.D. Cal. Nov 03, 2011) (same).

        Third, errors of state law that do not implicate constitutional concerns are not cognizable

in federal habeas.  *See, e.g., Shipley v. Oklahoma,* 313 F.3d 1249, 1251 (10th Cir. 2002);

*Whitmore v. Jones,* No. CIV-10-1346-M, 2011 WL 4376351, at *4 (W.D. Okla. Aug 16, 2011),

*appeal dismissed,* ___ F. App'x ___, ___ , 11-6261, 2012 WL 120075 (10th Cir. Jan. 17, 2012) .

        Since the underlying claim is without merit, the related but defaulted ineffectiveness

claim Petitioner seeks to is futile on both prongs of the *Strickland* test.

### B.  Remaining Ineffective Assistance Of Counsel Issues

As in the state post-conviction proceedings, Petitioner's remaining ineffective assistance of counsel claims converge on the proposition that the jurors would have found he acted in self-defense if trial counsel had only produced more evidence (or worked harder in questioning) to establish:  the victim in fact was carrying a gun; it was unclear whether Petitioner approached the victim with his gun in clear sight of the victim; the victim as a drug user was capable of violence, pulled something metallic out of his pocket, and made Petitioner fear for his life and shoot in self-defense; and the victim's friends likely removed the victim's gun from the crime scene.  *See Doc. 13* at 5-7, 10-12; *Doc. 14* at 1; *Record Proper* at 388-94, 404-05.

The trial court's summary dismissal of the ineffectiveness claims was not unreasonable.  Having reviewed the transcripts of the trial in their entirety, the essence of all of these points was before the jurors through the evidence the prosecutor and defense counsel either introduced or raised through questions, and or/through their closing arguments.  It is well-settled that an attorney's failure to introduce cumulative evidence does not establish prejudice.

> Other items of evidence [Defendant] argues his counsel should have introduced are merely cumulative of the evidence the jury did hear.  For example, [he] complains that his attorney should have presented proof that [he] never recovered emotionally after he was in a car accident at fourteen, and was "coddled" by his parents.  These same concepts, however, were communicated to the jury through the testimony of [Defendant's] half-sister, Donna Lomax.  We cannot say, as we must for Mr. Wackerly to prevail, that further presentation of the same evidence from different witnesses was reasonably likely to have made a difference in his sentence.  *See Humphreys v. Gibson,* 261 F.3d 1016, 1021 (10th Cir. 2001) (holding that failure to present evidence that is cumulative of evidence actually heard by the jury does not establish prejudice); *James v. Gibson,* 211 F.3d 543, 557 (10th Cir. 2000) (same); *Foster v. Ward,* 182 F.3d 1177, 1189 (10th Cir. 1999) (same); *Moore v. Reynolds,* 153 F.3d 1086, 1099 (10th Cir. 1998) (same).

*Wackerly v. Workman,* 580 F.3d 1171, 1182 (10th Cir. 2009), *cert. denied,* 130 S. Ct. 3387 (2010); *see also Wong v. Belmontes,* ___ U.S. ___, ___, 130 S. Ct. 383, 386 (2009) ("More evidence, the Court of Appeals now concluded, would have made a difference . . . .  [One of the] problems with this conclusion [is that]:  Some of the evidence was merely cumulative . . . adding it to what was already there would have made little difference.").

More importantly, the introduction of cumulative evidence does not establish prejudice. The jurors could have fully believed all of the points Petitioner touches on and still have reasonably determined that Petitioner was not entitled to self-defense based on his own testimony.  According to Petitioner, not only had the victim and his girlfriend previously cooperated with the police by trying to set up Petitioner, the victim also robbed Petitioner at gunpoint a few days earlier.  Upon seeing the victim on the open street where others were milling about and surveillance cameras were mounted, Petitioner thought it would be a good place to confront the victim about their relationship and to "settle" the matter.  Despite Petitioner's protestations that, in his mind, he did not intend to fight or harm the victim, he chose to initiate their meeting by exiting the car, walking toward the victim shouting obscenities and demanding the victim empty his pockets, holding a gun in his hand.  The jurors could easily have concluded from his own testimony that he "started the fight" and that the victim was not responding with force but with efforts to comply with Petitioner's directives.  *See Trial Transcript 1/29/09* at 30-40, 55-60, 77-78.

Wherefore,

**IT IS HEREBY RECOMMENDED** that the Motion to Amend the Writ of Habeas Corpus be granted, and that the § 2254 petition be denied, and this action be dismissed with prejudice.

**IT IS FURTHER RECOMMENDED** that no certificate of appealability issue.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---

_____
UNITED STATES CHIEF MAGISTRATE JUDGE